**Dr. Sualeh Kamal Ashraf**
8449 Sand Lake Shores Ct.
Orlando, Florida 32836
Tel 321-948-2063
Email: bestdocashraf@gmail.com

U.S. COURT OF APPEALS
RECEIVED
CLERK
FEB 13 2023
ATLANTA, GA

February 9, 2023

## COVER SHEET

Clerk of Court
11th Circuit
United States Court of Appeals
Atlanta, Georgia

     RE.    Petition For Review

Dear Sir/Madam:

     I am appealing the final decision Number: 4410-09-P of the Drug Enforcement Administration (DEA) against myself, Dr. Sualeh Kamal Ashraf, and was recorded in the Federal Registry on January 6, 2023.

     This action is based on 21 U.S.C. 877.

     Thank you and kindly look the corrected packet that you requested earlier this past Monday February 6, 2023.

Respectfully,



Dr. Sualeh Kamal Ashraf
8449 Sand Lake Shores Ct.
Orlando, Florida 32836
Tel 321-948-2063
Email: bestdocashraf@gmail.com

# United States Court of Appeals
### for the
### ELEVENTH CIRCUIT

| | |
|---|---|
| Dr. Sualeh Kamal Ashraf, | ) |
| | ) |
| Petitioner | ) |
| | ) |
| v. | ) |
| | ) |
| Drug Enforcement Administration | ) |
| (DEA), | ) |
| | ) |
| Respondent | ) |

## PETITION FOR REVIEW

Dr. Sualeh Kamal Ashraf hereby petition the court for review of the Final Order of the Drug Enforcement Administration (DEA): DECISION AND ORDER, BILLING CODE <u>4410-09-P</u>, entered against Dr. Sualeh Kamal Ashraf into the Federal Register on January 6, 2023.

Date: February 9, 2023

Dr. Sualeh Kamal Ashraf
PRO SE Attorney for Petitioner
8449 Sand Lake Shores Ct.
Orlando, Florida 32836
Tel 321-948-2063
Email: bestdocashraf@gmail.com

# United States Court of Appeals
### for the
### ELEVENTH CIRCUIT

| | |
|---|---|
| Dr. Sualeh Kamal Ashraf, | ) |
| | ) |
| Petitioner | ) |
| | ) |
| v. | ) |
| | ) |
| Drug Enforcement Administration | ) |
| (DEA), | ) |
| | ) |
| Respondent | ) |

---

## CERTIFICATE OF SERVICE

I am mailing copy of the forgoing Petition for Review to the United States Court of Appeals for the Eleventh Circuit of the Drug Enforcement Administration Final Decision to the address given to me by the Drug Enforcement Administration to the Administrator in quintuplicate copies as found under 21 CFR 1316.68, today February 9, 2023.

Dr. Sualeh Kamal Ashraf
PRO SE Attorney for Petitioner
8449 Sand Lake Shores Ct.
Orlando, Florida 32836
Tel 321-948-2063
Email: bestdocashraf@gmail.com

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N W
Atlanta, Georgia 303030

David J Smith
Clerk of Court

For rules and forms visit
www ca1 1 uscourts gov

February 1, 2023

Sualeh K. Ashraf
8449 Sand Lake Shores Ct.
Orlando FL 32836

This notice is to acknowledge receipt of your document(s) on ___February 1, 2023___.

**Your document(s) will be handled as described below:**

☐ This Court's records indicate that you have no open case pending in this Court. No action will be taken on your document(s).

☐ This Court is a federal court of limited jurisdiction. This Court has authority to act only on cases created under the statutes enacted by Congress. In general, only cases which have been first filed, and finally decided, in a United States District Court or Bankruptcy Court within this Circuit (Alabama, Florida, and Georgia), the United States Tax Court, and certain federal agencies may be appealed to this Court. This Court does not have authority to act in appeals from state and county courts. No action will be taken on your document(s).

☐ The Clerk's Office is unable to provide you with legal advice. No action will be taken on your document(s).

☐ The Clerk's Office is enclosing a copy of the form you requested and/or the Clerk's Office is enclosing a copy of this Court's pro se appellate handbook, which includes a variety of forms.

☐ You requested a specific form. The Court does not provide a form in this instance. No action will be taken on your document(s).

☐ With respect to your request, the Court's fee schedules are available on our website at www.ca11.uscourts.gov. You will be required to prepay the copying or other costs by sending a check payable to "Clerk – 11th Circuit Court of Appeals" in the amount of: $_____.

☐ You appear to seek copies of documents, but it is unclear what documents you seek. Please specify each document and the corresponding appeal number(s), if applicable. You will be required to prepay the copying costs.

☐ An appeal from a district court to a court of appeals may be taken only by filing a notice of appeal with the district court within the time allowed by FRAP 4. *See* FRAP 3. You mistakenly filed a notice of appeal with this Court. (Please note, that under 11th Cir. R. 22-1(a), this Court will construe a party's filing of an application for a certificate of appealability, or other document indicating an intent to appeal, as the filing of a notice of appeal.) Under FRAP 4(d), the notice of appeal will be transferred to the district court.

☐ An application for a writ of habeas corpus must be made to the appropriate district court. Under FRAP 22(a), the application will be transferred to the district court.

☐ Your document(s) appear(s) to have been intended for a different court. No action will be taken on your document(s).

☒ The Clerk's Office is unable to discern the purpose of your document(s) and/or your document(s) do(es) not appear to have been intended for this Court. Please provide clarification; otherwise, no action will be taken on your document(s).

☐ Your facility's library should have a copy of all rules provided by this Circuit. In addition, the Federal Rules of Appellate Procedure and the Eleventh Circuit Rules are available on our website at www.ca11.uscourts.gov.

☒ Other:
Your payment of $505.00, check number 184 has been returned. Payment for Appeals cases must be paid to the District Court. Your payment has been returned to the above address.

Rev. 9/20    FC



**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

Dr. Sualeh Kamal Ashraf,

        **APPELLANT**

v.

DRUG ENFORCEMENT ADMINISTRATION,
(DEA)

        **APPELLEE**

_____/

CASE NO.: DEA BILLING CODE
NO.: 4410-09-P

### NOTICE OF APPEAL

### FROM DEA DECISION AND ORDER, BILLING CODE 4410-09-P

      Dr. Sualeh Kamal Ashraf, Pro Se Appellant, hereby files this Notice of Appeal to the Eleventh Circuit Court of Appeal to appeal the Drug Enforcement Administration (DEA) DECISION AND ORDER, BILLING CODE 4410-09-P, pursuant to 21 U.S.C. 877 as this decision and order is termed in certain places as Final Order and the appeal requirements are: a) that the decision was a final order (even though it stated Decision and Order however FINAL ORDER was embodied somehow in the DEA communications unless a mistake was made by the DEA; b) that an appeal is permitted after exhaustion of administrative remedies; and c) this appeal is made within 30-days from entry into record which was 1/06/2023. The grounds for appealing the Drug Enforcement Administration Decision is found under title 5 U.S.C. 706.

      And pursuant to section 507 of 21 U.S.C. 877 as found under DEA Code 21 CFR 1316.68, copies in quintuplicate is served on the DEA Administrator.

Dated January 29, 2023.

                                                               Dr. Sualeh Kamal Ashraf (Pro Se)



**U.S. Department of Justice**
Drug Enforcement Administration

---

*Office of the Administrator*                              *Springfield, VA 22152*

December 28, 2022

Sualeh Ashraf, M.D.
801 West Oak Street, Ste. 104
Kissimmee, Florida 3474
skamalashraf@gmail.com

Sualeh Ashraf, M.D.
1188 SW Main Blvd., Ste. 2
Lake City, Florida 32025
skamalashraf@gmail.com

          Re:    Sualeh Ashraf, M.D.
                    Order to Show Cause

Dear Mr. Ashraf:

Pursuant to 21 C.F.R. § 1301.46, I hereby serve you with a copy of the Administrator's final Decision and Order regarding your Controlled Substances Act registrations numbered BA2668183 and W21001036C.

For purposes of 21 U.S.C. § 877 and your right to seek judicial review, notice of this final Decision and Order is rendered on the date of its publication in the Federal Register.

                                Sincerely,

                                OFFICE OF THE ADMINISTRATOR

Enclosure

Copy:  Diversion and Regulatory Litigation Section
          Office of Chief Counsel
          Drug Enforcement Administration

**UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION**

**SUALEH ASHRAF, M.D.
DECISION AND ORDER**

On September 30, 2021, the Drug Enforcement Administration (DEA) issued an Order to

Show Cause (OSC) to Sualeh Ashraf, M.D. (Registrant), of Kissimmee, Florida. Request for

Final Agency Action (RFAA), Exhibit (RFAAX) 1, at 1, 6. The OSC proposed the revocation of

Registrant's DEA Certificate of Registration, Control No. BA2668183, and the denial of

Registrant's pending application for an additional DEA Certificate of Registration, Application

No. W21001036C, alleging that Registrant has "committed such acts that would render [his]

registration inconsistent with the public interest." *Id.* at 1-2 (citing 21 U.S.C. §§ 824(a)(4) and

823(f)).[1]

The Agency makes the following findings of fact based on the uncontroverted evidence

submitted by the Government in its RFAA, dated July 21, 2022.

## I.  FINDINGS OF FACT

### A.  Investigation of Registrant

According to the DEA Diversion Investigator assigned to investigate Registrant (DI),

Registrant issued at least 33 prescriptions for controlled substances – specifically, oxycodone,

Adderall, hydrocodone, and zolpidem – to three individuals identified as J.L., D.L., and J.L.2

---

[1] On November 3, 2021, Registrant submitted a signed document titled "Corrective Action Plan" in response to the OSC; however, the document appears to be primarily a written response to the Government's allegations with a brief Corrective Action Plan and several attachments. *See* RFAAX 16. The document did not indicate that Registrant intended to request a hearing. RFAAX 16. On April 21, 2022, the DEA issued a letter to Registrant denying his proposed Corrective Action Plan and advising him of his retained procedural and due process rights. RFAAX 14. On May 10, 2022, Registrant responded by email, in which he again did not request a hearing, and the Government did not otherwise receive any hearing request from Registrant. RFAAX 15; RFAA, at 1-3; *see also* RFAA, at 3 n.1.

between September 27, 2016, and May 24, 2018. RFAAX 17, at 1-2; *see also* RFAAX 2. As part of the investigation, DI obtained a transcript of an interview that the Polk County Sheriff's Office conducted with Registrant on June 12, 2018. RFAAX 17, at 3; *see also* RFAAX 12. During the interview, Registrant stated that he could not recall issuing any of the prescriptions for oxycodone,[2] although he admitted to issuing prescriptions for zolpidem to J.L. as recently as the month prior to the interview. RFAAX 17, at 3; *see also* RFAAX 12, at 54-57. DI made numerous attempts to obtain patient records for J.L., D.L., and J.L.2, including serving multiple Administrative Subpoenas to Registrant as well as contacting both the Polk County Sheriff's Office and the Florida Department of Health.[3] *Id.* at 3-4. Ultimately, Registrant was unable to produce any records regarding the prescriptions in question. *Id.* at 2.

---

[2] Registrant stated that he did not recall prescribing oxycodone with acetaminophen to J.L. but left open the possibility that he did, stating: "…years ago if she had a headache or she had something she asked me I given [sic] 5 or 6 but not on a regular basis that I would remember . . ." RFAAX 12, at 58-59.

[3] On April 3, 2019, DI sent an initial Administrative Subpoena to Registrant at Registrant's residential address. RFAAX 17, at 3. According to the DI, on May 1, 2019, Registrant's attorney responded by email, writing that while Registrant recognized the names of the individuals listed in the subpoena as relatives of J.L., he did not have any independent knowledge that they were patients at the weight management clinic (Dr. Drop it Like it's Hot, "DDILIH") where Registrant worked as a physician and of which J.L. was the manager and registered agent. *Id.* at 2-3; *see also* RFAAX 11. Registrant's attorney also wrote that Registrant was positive that none of the individuals listed in the subpoena were ever patients of his separately located primary private practice and that even if they had been patients at the clinic where Registrant was employed (DDILIH), "all patient records at that office were confiscated by law enforcement at the time the office was raided and both [Registrant] and [J.L.] were arrested." RFAAX 17, at 3; *see also infra* I.C. (regarding the arrest of Registrant and J.L. for a separate matter). Registrant's attorney concluded that none of the records were returned to Registrant and so Registrant had no records to provide in response to the subpoena. RFAAX 17, at 3. On May 1, 2019, DI emailed Registrant's attorney informing him that he had not provided any information regarding the requested medical file for J.L. to which Registrant's attorney responded by email the next day stating that Registrant "did not have possession of any patient charts for any of the individuals identified in the subpoena." *Id.*

However, when DI contacted both the Polk County Sheriff's Office and the Florida Department of Health, he was informed that no patient records had been seized from DDILIH during the execution of a search warrant on June 12, 2018. *Id.* at 4. On July 19, 2019, DI served an Administrative Subpoena to the Florida Department of Health and was informed on August 27, 2019, that the Florida Department of Health did not have any patient files for J.L., D.L., or J.L.2. *Id.* On June 11, 2021, DI served additional Administrative Subpoenas to Registrant at Registrant's DEA registered address to which Registrant responded on June 25, 2021, again stating that every document from his place of business had been confiscated and thus he had no records to produce. *Id.*

Regarding Registrant's dispensing records, on July 26, 2017, DI made two visits to the clinic where Registrant was employed, DDILIH. *Id.* at 4. According to DI, Registrant stated that he began dispensing controlled substances in March 2017 and admitted to dispensing phentermine directly to uninsured patients. *Id.* Nonetheless, Registrant failed to produce an initial inventory of controlled substances and failed to produce any dispensing records of controlled substances in violation of 21 C.F.R. §§ 1304.03(b), 1304.22(c), and 1304.11(b).[4] RFAAX 17, at 5. After conducting an audit of DDILIH's supply of phentermine in comparison to Registrant's purchase invoices, DI concluded that 24,349 tablets of 37.5 mg units and 250 tablets of 8 mg units were unaccounted for.[5] RFAAX 17, at 5. After obtaining records from the Florida Prescription Drug Monitoring Program, DI also determined that Registrant failed to report his dispensing of phentermine to the Program as required by Florida law (Fla. Stat. § 893.055(3)(a)). *Id.*; *see also* RFAAX 9.

Additionally, DEA's investigation determined that Registrant failed to report the theft of 14 bottles of phentermine to DEA within one business day of discovery in violation of 21 C.F.R. § 1301.76(b), although the theft was reported to local police. RFAAX 17, at 5-6; *see also* RFAAX 10. Further, DEA's investigation determined that Registrant was dispensing phentermine in containers without warning labels that conformed to 21 C.F.R. § 290.5. RFAAX

---

[4] According to DI, Registrant stated that the inventory was in J.L.'s possession and that his dispensing records were annotated in his patients' medical records; however, when asked to produce a patient medical record with an included dispensing record, Registrant presented "a folder containing a document titled 'New patient information form,' a blank form with nothing to indicate that it pertained to a particular patient." RFAAX 17, at 5; *see also* RFAAX 4. The only other record that Registrant produced was "a form dated July 26 (no year specified) which associated just 30 37.5 mg dosage units of phentermine with a patient identified as Y.G." RFAAX 17, at 5; *see also* RFAAX 7.

[5] When asked by DI to produce his purchase invoices for phentermine, Registrant produced invoices indicating that he had purchased 20,000 37.5 mg dosage units of phentermine over five different dates. *Id.*; *see also* RFAAX 6. Upon contacting Registrant's distributor, DI determined that on two additional dates, Registrant purchased an additional 5000 37.5 mg dosage units of phentermine and 250 8 mg dosage units of phentermine for which he did not have any records. RFAAX 17, at 5. Upon conducting an audit of DDILIH's supply of phentermine, DI initially determined that Registrant only had 621 37.5 mg dosage units on the premises, with an additional 30 dosage units later discovered. *Id.*; *see also* RFAAX 5.

17, at 6; *see also* RFAAX 8. Finally, DI determined that Registrant failed to properly store phentermine in a "securely locked, substantially constructed cabinet," in violation of 21 C.F.R. § 1301.75(b), with Registrant admitting that J.L., who is not a DEA registrant, "stored controlled substances in her home during the hours when [DDILIH] was not open." RFAAX 17, at 6.

## B. The Government Expert's Review of Registrant's Prescriptions

The DEA hired Dr. Mark Rubenstein, M.D., to opine on Registrant's controlled substance prescribing based on the prescription and dispensing information described above (RFAAX 2). RFAAX 17, at 4; *see also* RFAAX 18, at 1. The Agency finds that Dr. Rubenstein is an expert in the standard of care for prescribing controlled substances in Florida and gives his expert report, *see* RFAAX 3, and his Declaration full credit in this Decision. *See* RFAAX 13; RFAAX 18, at 1.

Dr. Rubenstein reviewed seven prescriptions for oxycodone issued by Registrant to J.L. from March 17, 2017, through April 26, 2018, and found that on at least four of the prescriptions, Registrant wrote that the prescription was issued for "'pain.'" RFAAX 18, at 2; *see also* RFAAX 2, at 17-24, 27-32. According to Dr. Rubenstein, although there were no corresponding medical records, "the pattern, number, and frequency of these prescriptions indicate that [Registrant] issued [them] in order to treat some type of chronic nonmalignant pain."[6] RFAAX 18, at 2. Dr. Rubenstein explained the standard of care for the treatment of chronic nonmalignant pain with controlled substances in the State of Florida and concluded that "[b]ecause there were no medical records to review, none of the requirements for treating chronic nonmalignant pain [were] satisfied with respect to the oxycodone prescriptions issued

---

[6] Dr. Rubenstein noted that if Registrant had actually issued these four prescriptions to treat acute pain, Registrant would have been in violation of Florida regulations because the prescriptions were for 30-day supplies and Florida regulations provide that a prescription for a Schedule II opioid for acute pain may not exceed a seven-day supply. RFAAX 18, at 2 n.1; *see also* RFAAX 2, at 17-20, 27-32.

[by Registrant] to J.L." *Id.* Further, Dr. Rubenstein reviewed the prescriptions for Adderall that Registrant issued to J.L., D.L., and J.L.2 and concluded that "because there [were] no medical records to review, there [was] no evidence that [Registrant] issued these prescriptions for a medical purpose permitted by Florida law," nor was there "any evidence that the prescriptions were issued for any legitimate medical purpose." *Id.*; *see also* RFAAX 2.

Ultimately, Dr. Rubenstein found that there was "no evidence that [Registrant] kept any medical records to justify the course of treatment of [patients J.L., D.L., and J.L.2]." RFAAX 18, at 2. Based on his expert medical opinion, Dr. Rubenstein concluded, and the Agency agrees, that "[Registrant] engaged in a pattern or practice of prescribing [that] demonstrated a lack of reasonable skill or safety to [the] patients, that [Registrant] failed to document an appropriate physician-patient relationship with [the patients], and that [Registrant's] prescribing of controlled substances was not within the usual scope of professional practice and cannot be deemed issued for a legitimate medical purpose." *Id.*; *see also* RFAAX 3, at 4.

## C. Registrant's Case

As previously noted, Registrant responded to the OSC through a signed document entitled, "Corrective Action Plan." *See* RFAAX 16. The document includes a Corrective Action Plan and also details Registrant's position on the Government's allegations with supporting documentation.[7] *Id.*

Within the "Corrective Action Plan," Registrant offered explanation of his misconduct. RFAAX 16, at 2-6, 7-9. Registrant described how he began working with J.L. at their weight

---

[7] The Agency considers RFAAX 15 and 16 collectively as a written response. *See Creekbend Community Pharmacy*, 86 Fed. Reg. 40,627, 40,627-29, 40,636 (2021) (the Agency considered an ambiguous document submitted by the Respondent Pharmacy that contained both a written response to the OSC, not submitted in lieu of a hearing, and a Corrective Action Plan).

loss clinic, where J.L. was the business owner and Registrant was the doctor of record.[8] *Id.*[9] Regarding the at least 33 controlled substance prescriptions at issue, Registrant argued that he "did nothing wrong intentionally or otherwise," and repeatedly claimed that he did not issue the prescriptions.[10] RFAAX 16, at 2-6. Registrant suggested that it was likely that J.L. forged his signature and issued the prescriptions to herself.[11] RFAAX 16, at 2-6. Registrant also claimed that he had never met D.L., J.L.'s husband, that he had never met J.L.2, J.L.'s son, and that he did not even know that J.L. had a son. *Id.* at 3-4. Registrant argued that, because he did not issue the controlled substance prescriptions in question, he did not violate any state or federal laws nor did he fail to adhere to the Florida standard of care. *Id.* at 2-6. Finally, Registrant concluded that "[i]t should be obvious to the DEA that the criminal mind and the criminal muscle behind the endeavors described on the [OSC] are the works of J.L." *Id.* at 9.

Registrant proposed that, going forward, he would not leave his prescription pads outside of his briefcase or purview and would not allow anyone else to handle his prescriptions; that he would not allow anyone else to call in his prescriptions to pharmacies and would not give anyone else access to his passwords; and that he would monitor the prescription activity taking place under his name on the Florida Prescription Drug Monitoring Program online database. *Id.* at 2.[12]

---

[8] Registrant further described how J.L. "had alleged to be a nurse" and had a good reputation, but was later revealed to be unlicensed. *Id.* at 7-8.

[9] *See also id.* at 18-25. According to Registrant, in June 2018, J.L. was arrested for practicing health care without a license and Registrant was arrested for employing J.L. as an unlicensed nurse. *Id.* at 8, 13. According to Registrant, everything was investigated by Polk County Police over a period of years and "[t]he Polk County State Attorney's Office dismissed all of the charges against [him]" and that "the Court granted expungement of [his] arrest and criminal charges." *Id.* at 9; *see also id.* at 12-17.

[10] Compare this unequivocal denial to his statement to local police that he "[did not] recall" prescribing oxycodone with acetaminophen to J.L. while leaving open the possibility that "...years ago if she had a headache or she had something she asked me I given [sic] 5 or 6 but not on a regular basis that I would remember . . . ." RFAAX 12, at 58-59.

[11] However, in his recorded statement for the Polk County Sheriff's Office, Registrant seems to admit that he left pre-signed prescriptions for J.L. to fill out for patients when he was not available. RFAAX 12, at 15-18.

[12] On April 21, 2022, the DEA issued a letter to Registrant denying his proposed Corrective Action Plan to which Registrant expressed his disagreement in an email dated May 10, 2022. RFAAX 14; RFAAX 15. Registrant wrote, "In terms of the public safety: [J.L.] was not public as she was part of the employ [sic] apparatus that betrayed my

## II.    DISCUSSION

### A. The Five Public Interest Factors

Under the Controlled Substances Act (CSA), "[a] registration . . . to . . . dispense a controlled substance . . . may be suspended or revoked by the Attorney General upon a finding that the registrant . . . has committed such acts as would render his registration under section 823 of this title inconsistent with the public interest as determined under such section." 21 U.S.C. § 824(a). An application for a practitioner's registration may be denied upon a determination that "the issuance of such registration . . . would be inconsistent with the public interest." 21 U.S.C. § 823(f). In making the public interest determination, the CSA requires consideration of the following factors:

(1)    The recommendation of the appropriate State licensing board or professional disciplinary authority.

(2)    The applicant's experience in dispensing, or conducting research with respect to controlled substances.

(3)    The applicant's conviction record under Federal or State laws relating to the manufacture, distribution, or dispensing of controlled substances.

(4)    Compliance with applicable State, Federal, or local laws relating to controlled substances.

(5)    Such other conduct which may threaten the public health and safety.

21 U.S.C. § 823(f).

The DEA considers these public interest factors in the disjunctive. *Robert A. Leslie, M.D.*, 68 Fed. Reg. 15,227, 15,230 (2003). Each factor is weighed on a case-by-case basis. *Morall v. Drug Enf't Admin.*, 412 F.3d 165, 173-74 (D.C. Cir. 2005). Any one factor, or combination of factors, may be decisive. *David H. Gillis, M.D.*, 58 Fed. Reg. 37,507, 37,508 (1993).

---

trust in her as she prescribed to herself and family. It was not rampant public safety [sic]. Moreover, all I can think of in my plan to prevent future breach of trust is to keep my prescription pads locked under my control." RFAAX 15, at 1-2.

While the Agency has considered all of the public interest factors in 21 U.S.C. § 823(f),[13] the Government's evidence in support of its *prima facie* case for revocation of Registrant's registration and denial of Registrant's application is confined to Factors Two and Four. *See* RFAA, at 9-14. Moreover, the Government has the burden of proof in this proceeding. 21 C.F.R. § 1301.44. The Agency finds that the Government's evidence satisfies its *prima facie* burden of showing that Registrant's continued registration would be "inconsistent with the public interest." 21 U.S.C. § 824(f). The Agency further finds that Registrant failed to provide sufficient evidence to rebut the Government's *prima facie* case.

## B. Factors Two and Four

Evidence is considered under Public Interest Factors Two and Four when it reflects compliance (or non-compliance) with laws related to controlled substances and experience dispensing controlled substances. *See Kareem Hubbard, M.D.*, 87 Fed. Reg. 21,156, 21,162 (2022). The Government has alleged that Registrant's prescribing practices violated both federal and Florida state law. RFAAX 1, at 2-4. According to the CSA's implementing regulations, a lawful controlled substance order or prescription is one that is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Moreover, among the listed acts in Florida law that "shall constitute

---

[13] As to Factor One, there is no record evidence of disciplinary action against Registrant's state medical license. 21 U.S.C. § 823(f)(1). State authority to practice medicine is "a necessary, but not a sufficient condition for registration . . . ." *Robert A. Leslie, M.D.*, 68 Fed. Reg. at 15,230. Therefore, "[t]he fact that the record contains no evidence of a recommendation by a state licensing board does not weigh for or against a determination as to whether continuation of [or granting of a] DEA certification is consistent with the public interest." *Roni Dreszer, M.D.*, 76 Fed. Reg. 19,434, 19,444 (2011). As to Factor Three, there is no evidence in the record that Registrant has been convicted of an offense under either federal or state law "relating to the manufacture, distribution, or dispensing of controlled substances." 21 U.S.C. § 823(f)(3). However, "the absence of such a conviction is of considerably less consequence in the public interest inquiry" and is therefore not dispositive. *Dewey C. MacKay, M.D.*, 75 Fed. Reg. 49,956, 49,973 (2010). As to Factor Five, the Government's evidence fits squarely within the parameters of Factors Two and Four and does not raise "other conduct which may threaten the public health and safety." 21 U.S.C. § 823(f)(5). Accordingly, Factor Five does not weigh for or against Registrant.

grounds" for which disciplinary action may be taken are: "[e]ngaging in a pattern of practice when prescribing . . . controlled substances which demonstrates a lack of reasonable skill or safety to patients," Fla. Stat. § 456.072(gg) (July 1, 2016 to June 30, 2020);[14, 15] and violating a standard of practice for the treatment of chronic nonmalignant pain with a controlled substance,[16] Fla. Stat. § 456.44(3)(a), (b), (c), and (f) (July 1, 2016 to June 30, 2020). *See also* Fla. Stat. § 458.331(1)(m) and (q) (July 1, 2016 to Dec. 31, 2019) (setting out grounds for denial of a license or disciplinary action, including failing to keep legible medical records that justify the course of treatment of the patient and prescribing, dispensing, administering, mixing, or otherwise preparing a controlled substance other than in the course of the physician's professional practice, without regard to his or her intent).

Based on the credible and unrebutted opinion of the Government's expert, the Agency found above that Registrant's prescribing of at least 33 controlled substance prescriptions to at least three different patients was not within the usual scope of professional practice, that the prescriptions could not be deemed issued for a legitimate medical purpose, that Registrant failed to document an appropriate physician-patient relationship with the patients, and that Registrant engaged in a pattern or practice of prescribing that demonstrated a lack of reasonable skill or safety to his patients. *See supra* I.B. Further, there is no evidence in the record that Registrant

---

[14] By regulation, Florida states the purposes for maintaining medical records, including to "furnish documentary evidence of the course of the patient's medical evaluation, treatment, and change in condition." Admin. Code Ann. r. 64B8-9.003(1)(b).

[15] Relevant years' iterations of the provisions of Florida law cited in this Decision are either identical to or do not deviate substantively from the cited texts.

[16] Such standards of practice include: before beginning any treatment, conducting a documented and complete medical history and physical examination proportionate to the diagnosis that justifies treatment; developing a written individualized treatment plan for each patient; discussing, with the patient or specified associated individual, the risks and benefits of the use of controlled substances, including the risks of abuse and addiction, as well as physical dependence and its consequences; and maintaining accurate, current, and complete records that are accessible and readily available for review and that comply with legal requirements.

adhered to the requirements under Florida state law for issuing controlled substances to treat nonmalignant pain.

In addition, the Government has alleged that Registrant violated various federal regulations applicable to his dispensing of controlled substances. RFAAX 1, at 4 (citing 21 C.F.R. §§ 1304.03(b), 1304.22(c), 1304.11(b), 290.5, 1301.76(b), 1301.75(b)). Based on the DI's Declaration and the entire record, the Agency found above that Registrant failed to produce dispensing records in violation of 21 C.F.R. §§ 1304.03(b) and 1304.22(c); failed to produce an initial inventory of controlled substances in violation of 21 C.F.R. § 1304.11(b); failed to report the theft of phentermine to DEA in violation of 21 C.F.R. § 1301.76(b); and failed to store phentermine in a "securely locked, substantially constructed cabinet" in violation of 21 C.F.R. § 1301.75(b). *See supra* I.A. Further, there is also substantial record evidence that Registrant dispensed phentermine, a Schedule IV controlled substance, in violation of the requirements of 21 C.F.R. § 290.5. Accordingly, Registrant violated "applicable . . . Federal . . . law [ ] relating to controlled substances," which supports the Government's case for revocation. 21 U.S.C. § 823(f)(4).[17]

In sum, the Agency finds that the record contains substantial evidence that Registrant prescribed and dispensed controlled substances in violation of both federal and state law. The Agency, therefore, finds that Factors Two and Four weigh in favor of revocation of Registrant's registration and denial of Registrant's application and thus finds Registrant's registration to be inconsistent with the public interest in balancing the factors of 21 U.S.C. § 823(f).[18]

---

[17] The Government has also alleged that Registrant violated Fla. Stat. § 893.055(3)(a), which requires a dispensing practitioner to report to the Florida Prescription Drug Monitoring Program specific information about every controlled substance dispensed. RFAAX 1, at 3-4. Based on the DI's Declaration and RFAAX 9, the Agency found above that Registrant failed to report his dispensing of phentermine to the Florida Prescription Drug Monitoring Program in violation of Fla. Stat. § 893.055(3)(a). *See supra* I.A.

[18] Regarding Registrant's claim in his "Corrective Action Plan" document that he did not issue the controlled substance prescriptions in question and that, rather, it was J.L. who improperly issued them to herself and her family

## III. SANCTION

Where, as here, the Government has established grounds to revoke Registrant's registration and deny Registrant's application, the burden shifts to the registrant to show why he can be entrusted with the responsibility carried by a registration. *Garret Howard Smith, M.D.*, 83 Fed. Reg. 18,882, 18,910 (2018). When a registrant has committed acts inconsistent with the public interest, he must both accept responsibility and demonstrate that he has undertaken corrective measures. *Holiday CVS, L.L.C., dba CVS Pharmacy Nos 219 and 5195*, 77 Fed. Reg. 62,316, 62,339 (2012) (internal quotations omitted). Trust is necessarily a fact-dependent determination based on individual circumstances; therefore, the Agency looks at factors such as the acceptance of responsibility, the credibility of that acceptance as it relates to the probability of repeat violations or behavior, the nature of the misconduct that forms the basis for sanction, and the Agency's interest in deterring similar acts. *See, e.g., Robert Wayne Locklear, M.D.*, 86 Fed. Reg. 33,738, 33,746 (2021).

Here, Registrant has failed to accept responsibility, arguing that he "did nothing wrong intentionally or otherwise," and repeatedly insisting that J.L. was to blame for the improper prescriptions at issue because she was the "criminal mind and the criminal muscle." RFAAX 16, at 2-9. Even if J.L. did improperly issue the prescriptions in question, Registrant failed to admit any fault for allowing her to improperly use his registration which, as its holder, Registrant

---

members using Registrant's registration, the Agency has long held that a registrant is liable for the misuse of his registration by any person to whom he entrusts his registration. *See Kevin Dennis, M.D.*, 78 Fed. Reg. 52,787, 52,799 (2013) (collecting cases). During his interview with the Polk County Sheriff's Office conducted on June 12, 2018, Registrant admitted to leaving pre-signed prescription pads with J.L. for her to use his registration and stated that he and J.L. "[had] the trust." RFAAX 12, at 15-18. Thus, even if it is true that J.L. was the one who misused Registrant's registration, Registrant bears responsibility for her misuse because he entrusted her with his registration. *See Brian Thomas Nichol, M.D.*, 83 Fed. Reg. 47,352, 47,363 (2018) (collecting cases); *see also supra* n.11.

11

would be ultimately responsible for. Further, Registrant did not address, let alone accept responsibility for, any of his numerous dispensing violations. As such, Registrant has failed to establish that he unequivocally accepts responsibility such that the Agency can entrust him with registration.

When a registrant fails to make the threshold showing of acceptance of responsibility, the Agency need not address the registrant's remedial measures. *Ajay S. Ahuja, M.D.*, 84 Fed. Reg. 5,479, 5,498 n.33 (2019); *Daniel A. Glick, D.D.S.*, 80 Fed. Reg. 74,800, 74,801, 74,810 (2015). Even so, Registrant has not offered adequate remedial measures to assure the Agency that he can be entrusted with registration. *See Carol Hippenmeyer, M.D.*, 86 Fed. Reg. 33,748, 33,773 (2021). Here, although Registrant offered to "keep [his] prescription pads locked under [his] control" and to take other measures to ensure that nobody else would be able to use his registration, he did not offer a plan to address the numerous dispensing violations nor to ensure his future compliance with federal and state law regarding the dispensing of controlled substances. RFAAX 15, at 1-2; RFAAX 16, at 2.

In addition to acceptance of responsibility, the Agency looks to the egregiousness and extent of the misconduct, *Garrett Howard Smith, M.D.*, 83 Fed. Reg. at 18,910 (collecting cases), and considers both specific and general deterrence when determining an appropriate sanction. *Daniel A. Glick, D.D.S.*, 80 Fed. Reg. at 74,810. Here, the record contains substantial evidence that Registrant improperly issued at least 33 prescriptions for controlled substances to at least three different patients beneath the applicable standard of care and outside the usual course of professional practice and committed numerous violations of federal and state law. As such, revocation of Registrant's registration and denial of Registrant's application would deter Registrant and the general registrant community from the improper prescribing of

12

controlled substances as well as from ignoring their obligations to comply with federal and state laws regarding the dispensing of controlled substances.

In sum, there is simply no evidence that Registrant's behavior is unlikely to recur in the future such that the Agency can entrust him with a CSA registration, and when considered with the scope of Registrant's misconduct as well as considerations of deterrence, the balance of factors weighs in favor of revocation and denial as sanctions. Accordingly, the Agency will order the revocation of Registrant's registration and the denial of Registrant's application.

## ORDER

Pursuant to 28 C.F.R. § 0.100(b) and the authority vested in me by 21 U.S.C. § 823(f) and 21 U.S.C. § 824(a), I hereby revoke DEA Certificate of Registration No. BA2668183 issued to Sualeh Ashraf, M.D., deny the pending application for a DEA Certificate of Registration No. W21001036C submitted by Sualeh Ashraf, M.D., and deny any other pending applications submitted by Sualeh Ashraf, M.D in Florida. This Order is effective **[insert Date Thirty Days From the Date of Publication in the Federal Register].**

DEC 2 7 2022

Date: 12/27/2022

_____

Anne Milgram
Administrator

13

CLOSED - 400

RUN 02/12
ELEVENTH CIRCUIT
56 FORSYTH ST NW
ATLANTA GA
(447) 02/12-02/12   30303-2218.56   [G]
ETP 7

U.S. Marshals Service
Atlanta CA 30303

CLEARED DATE

447-4024FL

0311   MON 02/13 05:14 SM 20 5406812
ELEVENTH CIRCUIT
56 FORSYTH ST NW
ATLANTA GA
30303-2218.56   [G]
ETP 7
PO SP 100 Y

Reuse

FROM:          (352) 368-9779
ASHRAF
1202 SW 17TH STREET SUITE 201
OCALA FL 34471
US

SHIP DATE: 10FEB23
ACTWGT: 1.00 LB
CAD: 114519749/WSXI3600
DIMMED: 12 X 10 X 1 IN

BILL SENDER

TO **UNITED STATE COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**56 FORSYTH ST NW**

**ATLANTA GA 30303**                    **(US)**
(555) 000-0000          REF: ASHRAF
INV1 PKG ID: 117207
PO:                          DEPT:

**FedEx**
Ground

**G**

TRK# **3944 7374 5356**

**30303**

9622 0019 0 (000 000 0000) 0 00 3944 7374 5356





SEE NOTICE ON REVERSE regarding UPS terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.
BBD BF2 1222

Sualeh Kamal Ashraz MD
8449 Sand Lake Shores CT
Orlando
FL 32836

UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT
56 FORSYTH STREET, N.W.
ATLANTA
GA 30303